**RECEIVED**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

AUG 01 2024

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

*VICTORIA C. GILES*

Plaintiff(s),

vs.

*Metro Transit & Metropolitan Council*

Case No.  24-cv-3123 (ECT/DLM)
(To be assigned by Clerk of District Court)

DEMAND FOR JURY TRIAL

YES ☑    NO ☐

Defendant(s).

(Enter the full name(s) of ALL defendants in
this lawsuit.  Please attach additional sheets
if necessary).

**COMPLAINT**

PARTIES

1. List your name, address and telephone number.  Do the same for any additional plaintiffs.

   a. Plaintiff  *VICTORIA C. GILES*

   Name  *VICTORIA C. GILES*

   Street Address  *700 7th St. NW. Apt#411*

   County, City  *New Brighton, MN. 55112*
   *RAMSEY CTY.*

   State & Zip Code  *55112*

   Telephone Number  *952-299-9067*

2. List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption.

a. Defendant No. 1    *METRO TRANSIT*

   Name    *METRO TRANSIT*

   Street Address    *600 N. Oen Street/Ave.*

   County, City    *MINNEAPOLIS MN. 55411*

   State & Zip Code    *HENNPIN (Cty)*

b. Defendant No. 2    *Metropolitan Council*

   Name    *390 Robert St.*

   Street Address    *St Paul, MN. 55101*

   County, City    *Ramsey (Cty)*

   State & Zip Code    *55101*

c. Defendant No. 3

   Name    *N/A*

   Street Address

   County, City

   State & Zip Code

**NOTE: IF THERE ARE ADDITIONAL PLAINTIFFS OR DEFENDANTS, PLEASE PROVIDE THEIR NAMES AND ADDRESSES ON A SEPARATE SHEET OF PAPER.**
**Check here if additional sheets of paper are attached:** ☑
**Please label the attached sheets of paper to correspond to the appropriate numbered paragraph above (e.g. Additional Defendants 2.d., 2.e., etc.)**

JURISDICTION

Federal courts are courts of limited jurisdiction. Generally, two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount of damages is more than $75,000 is a diversity of citizenship case.

3. What is the basis for federal court jurisdiction? *(check all that apply)*

   ☑ Federal Question        ☐ Diversity of Citizenship

4. If the basis for jurisdiction is Federal Question, which Federal Constitutional, statutory or treaty right is at issue? List all that apply.

   *(handwritten: Longley v Holder Violations of Civil Rights Due Process of the ... U.S. 14th & 5th Amendment Fed. Employee Whistle Blower FBI 18 USC 286 ... EEOC TITLE VII 1964 704(a) 5 USC 2302(b) All civil cases arising under the constitution laws & treaties of the U.S.)*

5. If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party? Each Plaintiff must be diverse from each Defendant for diversity jurisdiction.

   Plaintiff Name: _____        State of Citizenship: _____

   Defendant No. 1: _____        State of Citizenship: _____

   Defendant No. 2: _____        State of Citizenship: _____

   **Attach additional sheets of paper as necessary and label this information as paragraph 5.**
   **Check here if additional sheets of paper are attached.** ☐

6. What is the basis for venue in the District of Minnesota? *(check all that apply)*

   ☑ Defendant(s) reside in Minnesota    ☑ Facts alleged below primarily occurred in Minnesota

   ☐ Other: explain _____


STATEMENT OF THE CLAIM

Describe in the space provided below the basic facts of your claim. The description of facts should include a specific explanation of how, where, and when each of the defendants named in the caption violated the law, and how you were harmed. Each paragraph must be numbered

separately, beginning with number 7. Please write each single set of circumstances in a separately numbered paragraph.

7. Defendants violated section 70 4(a) of Title VII (RETALIATION) Discrimination, Harassment Hostile work environment ADA Disability Act violation.

CLAIM → On April 15th 2024 The Plaintiff had an accident driving the Bus at work inside company 4th street garage The day of accident due Plaintiff suffered injuries the day of Accident occur due to Manager giving unsafe Bus (Wheel Slack Play) more the 2 inches & unsafe to work. The plaintiff informed the previous Night at work to the supervisor Manager Camille & Sleese to go to work to Medical Attention. But released to leave for Medical Attention. Or Ordered (at scene of Accident) Manager Camille + Joan Plaintiff to work as normal. After reports Pink Eyes (Bothe eyes) Pless Infected Camille Cast Denile Manager took Plaintiff Have a Nice Day. The accident occurred 1 hour later. The Review began with Denya Denona compensation cut Benefits Administrie Learn Louden' Mills violation of Due Process finally mothers Day called in from Medical leave Terminated.

Attach additional sheets of paper as necessary.

Check here if additional sheets of paper are attached: ☐

Please label the attached sheets of paper to as Additional Facts and continue to number the paragraphs consecutively.

→ See Attached - tried to Resolved with Through ATU 1005 Union Reps But Deny Due to Provide Contract Clause EEOC Right to Sue.

REQUEST FOR RELIEF

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking.

Statement of Relief

*(1) Treat the Courts will Render All Monetary Loss Back Pay Awards Medical Treatments & Attorney Fees

(2) Award Credit (bank/Ruptcy Case) Eviction started Filed

(3) AAA Act Awards - Mental pain & Suffering. Restraining Order Credit Repair/Damage

(4) Restoraden off All Relate Debt Pay off All Related Debt occurred STOP Stalking Me.

Suppose that an employee charges her employer with racial discrimination. If the employer subsequently discharges that employee for making the charge, the employee has a remedy under the anti-retaliation provision of Title VII of the Civil Rights Act of 1964.' But suppose instead that an employee leaves her job and charges her former employer with racial discrimination, claiming constructive discharge.

2 Later a prospective employer requests a reference from the applicant's former employer. If the former employer, in retaliation for the ex-employee's initiation of a race discrimination suit, provides a negative reference that prevents her from obtaining the new job, it is questionable whether the former employee has a remedy under Title VII.

The debate surrounding this issue centers on differing interpretations of Title VII's anti-retaliation provision. Section 704(a) of Title VII specifically protects both "employees" and "applicants for employment" against employer retaliation.

3 Because the provision does not include the term "former employee," however, it is unclear whether a former employee has a cause of action under section 704(a) against a former employer for acts of retaliation that occur after the employment relationship has ended. Some federal circuit courts have found that the plain statutory language of section 704(a) indicates that Congress intended to protect only employees and applicants for employment

4 In other words, if Congress 1. Civil Rights Act of 1964, § 704(a) (codified as amended at 42 U.S.C. § 2000e-3(a) (1988)) ("§ 704(a)"); see, eg., Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 897 (3d Cir. 1993) (holding that the firing of an employee who alleges race discrimination in the workplace constitutes retaliation in violation of § 704(a)). 2. A plaintiff who claims constructive discharge must allege that her employer rendered working conditions so intolerable as to compel the employee to quit voluntarily. See Parratt v. City of Connersville, 737 F.2d 690, 694 (7th Cir. 1984), cert dismissed, 469 U.S. 1145 (1985); Clark v. Marsh, 665 F.2d 1168, 1176 (D.C. Cir. 1981). 3. Section 704(a) provides, in pertinent part: It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment,... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a) (1988). 4. See Polsby v. Chase, 970 F.2d 1360, 1365 (4th Cir. 1992) (holding that Title VII does not protect former employees against post-employment discrimination), vacated on other grounds sub. nor. Polsby v. Shalala, 113 S. Ct. 1940 (1993); Reed v. Shepard, 939 F.2d 484, 492-93 (7th Cir. 1991) (same). The Supreme Court granted certiorari in the Polsby decision and remanded the case to the Fourth Circuit for reconsideration in light

(2)

NEW

In addition to finding that section 703(a)(1) of **Title VII applies in the post-employment context, courts have also held that other remedial labor statutes protect former employees.** These findings provide additional support for the application of section 704(a) to post-employment retaliation.

 1. The Fair Labor Standards Act and the National Labor Relations Act Title VII is part of Congress' continuing effort over the past fifty years to provide increased statutory protection for employees.52

Recognizing Congress' progressive efforts in employment law, courts interpreting Title VII have been persuaded by judicial analyses of other labor statutes such as the Fair Labor Standards Act of 1938 3 (the "FLSA") and the National Labor Relations Act54 (the "NLRA")." As with Title VII, Congress intended the FLSA to be a "broadly remedial and humanitarian statute "56 The FLSA was an "ambitious effort to [increase] wages and influence the length of the workweek.'"

57 Congress enacted the NLRA to protect workers in their organizational efforts and union activity and to provide for peaceful resolution of industrial disputes. 8 Like Title VII, the FLSA and the NLRA were enacted to correct perceived inequities and imbalances in the workplace. For example, both the FLSA and the NLRA contain anti-retaliation provisions that are similar to section 704(a) of Title VII.59 It is not surprising, then, that courts interpreting section 704(a) have turned for guidance to cases that 52.

 See Rutherford Food Corp. v. McComb, 331 U.S. 722, 723-24 (1947); Dunlop v. Carriage Carpet Co., 548 F.2d 139, 143 (6th Cir. 1977). 53. 29 U.S.C. §§ 201-219 (1988 & Supp. III 1991). 54. 29 U.S.C. §§ 151-168 (1988 & Supp. III 1991). 55. See Dunlop, 548 F.2d at 142-43; Rutherford v. American Bank of Commerce, 565 F.2d 1162, 1165-66 (10th Cir. 1977); Pettway v. American Cast Iron Pipe Co., 411 F.2d 998, 1005-06 (5th Cir. 1969). 56. Dunlop, 548 F.2d at 143. 57. Sanford Cohen, Labor Law 58 (1964); see also Rutherford Food Corp. v. McComb, 331 U.S. 722, 727 (1947) (The FLSA was "[a]n effort to eliminate low wages and long hours [in order to] free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers."). 58. See Barbara Lindemann Schlei & Paul Grossman, Employment Discrimination Law 698 (2d ed. 1983 & Supp. 1989).

 59. Section 8(a)(4) of the **NLRA** provides: It shall be an unfair labor practice for an employer- [Vol. 62 1993] **POST-EMPLOYMENT RETALIATION 215** have interpreted the anti-retaliation provisions of the NLRA and the FLSA.

For example, in **Pettway v. American Cast Iron Pipe Co**.," the Fifth Circuit found **support from section 8(a)(4) of the NLRA61 and section 15(a)(3) of the FLSA62 in its interpretation of section 704(a) of Title VII.63** The court noted that although there are differences among the statutes, the similarities between the anti-retaliation provisions of Title VII, the NLRA, and the FLSA support the conclusion "that protection must be afforded to those who seek the benefit of statutes designed by Congress to equalize employer and employee in matters of employment."" In fact, the court found the language of Title VII to be broader than that contained in the NLRA and the FLSA,65 providing further support for a liberal reading of section 704(a). (4) to



discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter. 29 U.S.C. § 158(a)(4) (1988). Section 15(a)(3) of the FLSA provides, in pertinent part: [I]t shall be unlawful for any person- (3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee. 29 U.S.C. § 215(a)(3) (1988). Note that section 704(a) of Title VII covers both "applicants for employment" and "employees," see supra note 3, whereas the anti-retaliation provisions of the FLSA and NLRA cover only "employees."

Based upon this distinction, a court such as the Fourth Circuit in Polsby v. Chase, 970 F.2d 1360 (4th Cir. 1992), vacated on other grounds sub nora Polsby v. Shalala, 113 S. Ct. 1940 (1993), could assert that § 15(a)(3) of the FLSA and § 8(a)(4) of the NLRA are broader than § 704(a) of Title VII, and therefore that the FLSA and NLRA should not be used as persuasive support for Title VII.

The Polsby court stated that because "Congress considered it necessary to add 'applicant for employment' as a person distinct from 'employee' to be protected from retaliation, Congress could certainly have also included a former employee if it had desired." Id. at 1365; see supra notes 10-13 and accompanying text. Based on the Polsby court's reasoning, the inclusion of "applicants for employment" demonstrates Congress' intent to limit the coverage under § 704(a). It would follow that because Congress did not use such limiting language in the anti-retaliation provisions of the FLSA and the NLRA, the provisions were intended to have a broader remedial scope.

However, the better argument may well be that § 704(a) protects "applicants for employment" in addition to "employees" because Congress determined that it was necessary to protect individuals who had not yet entered into an employment relationship against retaliation by potential employers. See supra notes 14-16 and accompanying text

Based on this reasoning, § 704(a) may well be broader than the anti-retaliation provisions of the FLSA and the NLRA.

See infra notes 64-65 and accompanying text. 60. 411 F.2d 998 (5th Cir. 1969). 61. See supra note 59. 62. See supra note 59. 63. See Pettway, 411 F.2d at 1005-06. 64. Id at 1006. 65. See id at 1005-06, 1006 n.18 ("The protective provisions of Title VII are substantially broader than even those included in the Fair Labor Standards Act and the National Labor Relations Act .... This indicates the exceptionally broad protection intended for protestors of discriminatory employment practices.").

FORDHAM LAW REVIEW Similarly, in Ford v. Alfaro, 6 a case involving an unlawful discharge claim, the Ninth Circuit specifically looked to the anti-retaliation provisions of Title VII and the NLRA when interpreting section 15(a)(3) of the FLSA. 67 The court found that section 15(a)(3) is analogous to the anti-retaliation provisions contained in section 8(a)(4) of the NLRA and section 704(a) of Title VII. 6s

(4/

**The court, therefore, held that "the case authority interpreting these analogous provisions [in the NLRA and Title VII] is instructive in the context of the FLSA."69 Significantly, courts have found post-employment retaliation by a former employer to be actionable under the FLSA. In Hodgson v. Charles Martin Inspectors of Petroleum, Inc.,7 former employees had cooperated in a government investigation against their former employer. In light of the potential need to obtain references from their former employer, the court held that** the possibility of future retaliation against these ex-employees by the employer was significant: "In such a case the former employee would stand the same risk of retaliation as the present employee.

There is no ground for affording any less protection to ... former employees than to ... present employees."'" Similarly, at least one court has held that post-employment retaliation violates section 8(a)(4) of the NLRA even though the statute does not explicitly mention "former" employees.72 In NLRB v. Whitfield Pickle Co. ,7 an employer refused to rehire a former employee allegedly because she had filed unfair labor practice charges against her employer.

 **The court concluded that, regardless of whether the former employee actually proved the unfair labor practice charges, the employer's discriminatory refusal to rehire the individual violated the NLRA's anti-retaliation provision.74 66. 785 F.2d 835 (9th Cir. 1986). 67. See id. at 840 & n. 1. 68. See id. 69. Id. at 840. 70. 459 F.2d 303 (5th Cir. 1972). 71. Id. at 306 (citing Wirtz v. B.A.C. Steel Prods., Inc., 312 F.2d 14 (4th Cir. 1962)).** It should be noted that the actual claim in Hodgson was not brought under § 15(a)(3), the anti-retaliation provision of the FLSA. Rather, the court used the example of an employer sending unfavorable post-employment references to demonstrate that former employees are not removed from the threat of retaliation.

See id. Although it is dictum, the example demonstrates the court's opinion that former employees would be protected under the FLSA. ***See Dole v. International Ass'n Managers, Inc.,* Civ. No. 90-0219PHX RCB, 1991 WL 270194 at \*3 (D. Ariz. Apr. 2, 1991) (citing Hodgson, 459 F.2d at 305, for the proposition that the threat of retaliation exists for former** as well as current employees); **Brock v. Frank V. Panzarino, Inc.,** 109 F.R.D. 157, 158 n.2 (E.D.N.Y. 1986) (citing Hodgson, 459 F.2d at 305, for the proposition that "[r]etaliation [may] take the form of a refusal to rehire or of providing a future employer with a negative reference"). 72. See supra note 59. 73. 374 F.2d 576 (5th Cir. 1967). 74. See id. at 582-

Signed this _1st_ day of _August_

Signature of Plaintiff _____

Mailing Address _VICTORIA S. GILES #411_
_RD 7th St. NW Apt #411_
_New Brighton, MN 55112_

Telephone Number _952-299-9067_

Note:  All plaintiffs named in the caption of the complaint must date and sign the complaint and provide his/her mailing address and telephone number.  Attach additional sheets of paper as necessary.

Victoria C. Giles
700 7th Street NW Apt #411
New Brighton, MN. 55112

Vs

Metro Transit Metropolitan Council
I. 390 **Robert St**. N. St. Paul, MN 55101 .

Statement of Claim
Violating EEOC
Title VII 1964 Human Rights Act

7.   On January 15th, 2024 MetroTransit division of Metropolitan Council drug-screened, DOT tested and physically passed Victoria C. Giles("herein Ms. Giles' '), an experienced CDL Class B licensedTransit Operator. Ms. Giles's class consisted of eight drivers, seven males and one female.   Ms. Giles and Andre "Dre"(african american male), classmates out of the eight trainees fully licensed (experienced Class A" & B air brakes-passenger endorsement), and ready to train for driving the buses /coaches. On March 5th 2024 at the North Loop Garage, Metro Transit held a graduation ceremony on behalf of Ms. Giles, and seven other classmates. Accordingly, Metro Transit assigned routes and Coach buses & RTT bus' Trainer to   Ms.Giles  training her on learning coaches and certifying her as a Coach Driver . Additionally, the Trainers assist new driver(s), on backing the bus, driving and all necessary skills needed to safely operate the bus.  Ms. Giles was cheated out of her ***drive time*** given a trainer that stated the managers-Scott and Camille known or should have known that he **does not know how *train completely or drive the coach buses very well*.**
**Federal Funding Misappropriation:**
 Ms. Giles discovered that Metro Transit through DOT receives  ***$294 Billion Federal funding*** is given annually to train each driver federal with an annual five percent of that is _$14.7 B_,  if he knows very little in teaching about the new coach drivers-how to drive on certain roads and freeways.
 However, he trains well and the wheel chair ramp opens /closes but not too well on up hills. Coaches must raise the bus etc...
_Shabby training_ for the amount of federal funding given to train drivers and to retain them.   The department of labor and industries has set forth a training program to help drivers succeed and travel with their new training anywhere  but how can they with trainers and managers allegedly exercising sham training.
Ms. Giles reported to the Trainer her decreased training coach' hours  ranging 7 days 8 hours days to two days and two hour drive time basically, training on coaches non-existence.
Again,Ms. Giles reported her concerns to upper managers  Camille, Scott and other managers but they didn't care; and informed Ms.Giles, forget about it because she would never use it.

Documenting false training hours is a hindrance to a student's success. Causation of racial disparities inflicting sexism;  purposely, training a white male (David) while simultaneously, ignoring the screams for equality for inclusion of training. Yet denying a  black/native female Ms. Giles,  no training at all. Nevertheless,  falsifying government funding documents of equal training and equal pay.

 After Ms. Giles reported the fraudulent training scams to all of the managers, trainers, and co-workers even on tape with the coach buses/training cars/buses and the India trainer.

 Ms. Giles, received immediate backlash from hostile looks from managers, lies concerning schedules training and trainers changed abruptly,,given wrong  paddle directions given by Scott Drivers Manager.

Ms. Giles, suffered immediate repercussions of daily brakes problems like low air pressure, screaming breaks, mechanical yelling at Ms. Giles, angry about checking the brakes:steering-wheel too slack in wheel , mirrors tamper-falling off while on the freeway couldn't see anything at dark morning hours.

 Near fatal accident with semi-trucks training route 724A Starlite Brooklyn Center.

 This was a setback for Ms.Giles training because she wanted to drive coaches and own her own coach bus for churches and host marriages outside of the Metro Transit but was cut short . Scoot Camille and the schedulers everyone help her learn the coach.  After hearing Ms. Giles requests and eagerness to learn the coach buses she only was trained two hours drive time two days. David a white male and classmate, received full seven days training and was certified.

 The Trainer  was nice but from India it was a language barrier.  The Trainer took lots of breaks with very little route training on the main five routes, only two main routes practiced. This was a disadvantage for Ms. Giles because she would have to learn the bus's operational and the assigned route while on the road. Route 3 E bound St.Paul, nearly killed Ms. Giles with Blood pressure at 250/160 chest hurting dust of mold from Drivers fan ended up in the hospital carried by ambulance with safety brakes issues, brake lag and paddle being stolen during pre tripping off the bus while Ms. Giles pretrips it.

 A Street Supevior. Joanne harassment satared first day of route #3 by  stopping Ms. Giles  for no reason heard that dispatch told her to go directly to University of Minnesota and began to pick up  a new paddle and a new bus on the way if she could make it to Union Depot St. Paul after hearing central sending someone out to meet the bus with a new paddle she stops oit to send Ms. Giles

8.Ms Giles, completed her 3. 5 months of her probationary period and was tested by a Manager for ride along. Ms. Giles exceptionally passed her first three and half months of driver Operational Exam with highest achievements. (See Attached awards and exams).

This action was met with a hostile work environment.  Ms. Giles, always an hour early had someone break into her mail and insurance was missing off car payment. Called the Dispatch no answer. Scott the Driver'Supervior wrote up Ms. Giles for being 3 minutes late for her training check in and sent her home missings an entire day of training.

8.Upon entering North Loop Garage and going through orientation with co-student David,

Ms. Giles experienced onset harassment in forms of sexual, physically, mentally involving bus operational safety,  safety issues involving  discrimination and retaliation, by her manager Camille Mitchell, and Joanne and Scott ( driver managers) Dispatchers-white male and female. Upon Reporting the issues to Managers, co-workers other trainers the harassment increase worker compensation denied three times; retaliation occurred weekly both physical and mentally work and to reason for wrongful discharge,

9.The first day of orientation with Camille Mitchell, She asked Ms. Giles "what is she doing working as a Metro Transit Bus Driver with her background bus driver? The tone was sarcastically done.  Why was she there?" Ms Giles, explained her love to help others and ten year background history as a school bus driver. Additionally, Ms. Giles, explained how she has been gang-stalked by her ex-employer and ex-attorney with military and police help. A Restraining order was presented to Camille and Metro Transit concerning the gang stalking.

10.Ms. Giles was immediately signed to a Trainer that did not teach her all of her routes nor did she have necessary drive time in acquiring skills of navigating assigned routes before  she was expected to drive them alone . This action would serve as a catalMarch 5th 2024 at the North Loop Garage, Minneapolis Minnesota.yst to harm Ms Giles chances of successfully completing her routes in a timely manner and or proper knowledge of Coach buses and only 2 -4 hours of drive time. This action set the stage for more discrimination and harassment to follow and harm Ms. Giles.

11.  David-( a white male classmate of Ms. Giles creole/native american); Trainer Mark, spent time the entire 2 weeks and trained David.  There were 2 weeks of route training and driving those routes are crucial in learning them. Thus, Ms. Giles was only trained on two routes with a lot of paper signing and no actual drive time to learn.

12.This discriminatory action was the first setup to probation-**failure for** Ms.Giles. However,out of the two routes one expired on March 14th, 2024 route 724 Brooklyn Center/ Starlite. Seven Days(7), in accordance with the manual at all garage.

13.The 724 Starlie Route is where Ms. Giles, nearly crashed with semi trucks headed out with a mirror that was purposely unscrewed and falling down to the ground. This brake lag, no brakes, low air pressure,  the mirrors were purposely turned upward facing the sky set  high impossible for  Ms. Giles or anyone short to reach it, surprisingly. The mirrors' had missing screws;  also found on the  inside urine/feces, books calling Ms. Giles a BITCH left on the bus at least 1,000 blue COvid 19 masked stuffed inside the driver overhead seat storage causing issues with storing lunch and handbag.  Ms. Giles reported this *retaliation to Camille and managers but told them to deal with it because it happens to everyone.*

14.Sexually Harrsement Retalltion, discrimination  and hostile work environment
In addition to comments to Ms. Giles, about why are you working here Camile Mitchell visited Ms. Giles, during a break of class inquiring if she has a "Man". Ms Giles, stated no. Camile ordered Ms. Giles, to stay away from the men at her job. A week late Driver Appreciation week

lunch at North Loop Dre a classmate and african american friend of Ms. Giles, is told by another black male named Maurice (Transit 10 years-Sr. Driver), hugging Ms. Giles without notice while demanding that Dre leave her alone "You can't have her,", while hugging on Ms. Giles. Ms. Giles, shocked and so was Dre. Camile the manager saw this action and grew angry at Ms. Giles and increased harassment began with no relief.

15.Ms. Giles, was called into the office about resolved matters of the garage door slammed shut Driver couldn't leave out until a minute later on pull out time. Mark Lawrwason wrote Ms. Giles up, Camille called in the office meeting demanding answers with the written explanation that the mechanic drove the bus out due to a broken door. They were aware of this because it was called into Central and to Dispatch and to them in writing by Ms. Giles. This went on from Dispatch giving wrong directions, calling during driving and forcing them to drive all night with low air pressure of slack in the steering wheel like the day of the accident on April 15th 2024. Upon reporting the allegations of discrimination, retaliation and hostile work environment

16,All of the action on behalf of MetroTransit caused Ms. Giles irreparable harm both mentally and physically.
 With severe harmMs. Giles, is currently under doctor' care without medical insurance(State of Minnesota MA given her only 1 month of care-citing her income was to high in the past) that Metro cut off May 31,2024; Blocked unemployment for nearly a month, falsified statements, sent false files to all federal and state agencies the Minnesota Unemployment, Attorney General office, employment retaliation to EEOC, Human Rights of Minnesota and Ms. Giles, under the American Disability Act now has a service animal for emotional trauma from these violations.(see Dr. Small Service Animal) .

17. On February 19, 2024 Ms. Giles was harassed and pulled over by a street Supervisor named JoAnn (white female), route 3 a route that Ms. Giles had NEVER driven in a bus with two different trainers with three different directions from Managers andTrainers. Metro Transit Manager Camille Mitchell used to text Ms. Giles, come to the hospital on February 19th, 2024 to see what was happening but not for good only to continue lying and inflicting harm until she wrongfully termination of Ms. Giles. Camille laughs at Ms. Giles, during the hearing as she was questioning her with why she left the bus and refused 911. Why did she ask the police officer if he was following her and if he is a member of the proud boys that has been stalking her through her ex-employer and ex attorney?

18. Camile Mitchell knew that the company had set up Ms. Giles, to lose her job and lied on and to Ms. Giles n about the
Administrative hearing is nothing but routine. while plotting her demise. After assuring her that only four hours of training is necessary after the Louder Mills Administrative (only 1 meeting). Please, see other Evidence claims.

4

19. Ms. Giles tried contacting the ATU Union 1005 they tried getting job back citing wrongful termination , Louder Mills hearing deny due process to Ms. Giles. However, the union found no other charges in file except the chargeable accident dated April 15th 2024. No reason for termination. However, ATU 1005 Andrew and David states the contract with Metro Transit barred them from filing a grievance although they found discrimination and retaliation but needed Ms. Giles must obtain a lawyer and take it to court. (see EEOC letter right to sue & AtU 1005 Andrew letter citing discrimination);  Accordingly, ATU hands are tied nothing but "the contract MetroTransit has allowed them to fire anyone before six months probation has expired. Therefore lawsuit EEOC tried to resolve and get Ms. Giles , medical , job back or monterey lost with worker's compensation but Metro hired a lawyers to fight Ms. Giles, worker's compensation and lied on records of Ms. Giles, has five accidents to the state and government agencies.I
On July 17, 2024 EEOC issued Ms. Giles the right to sue based on ADA violations, Title VII 1964 Civil Rights Act (a)  and other cases.
Ms. Giles tried contacting internal human resources of Metro Transit and Metropolitan Council before heading to EEOC; nothing happened, they said sorry, probation has barred them.
No Relief  Therefore Plaintiff, request the court Request For Relief:EEOC issued the right to sue citing not enough manpower or federal funding to investigate with 3,000 cases Ms. Giles' case was issued the right to sue for ADA violations, Harassment, Discrimination, Retaliation, and hostile work environment.

# The Reliefs

Plaintiff, request the Court  a Statement of Relief

1. In this matter monetary damages,that the court deems just and fit; and an injunction to be awarded for pain and suffering, all medical back pay, in full and for life.  Repair Credit damages. Reinstatement of all life, medical , health, disability and  dental Attorney fees. Family pain & suffering mental anguish.
2. In an employment law case, ask for reinstatement to medical , disability, f or for back pay.

Cases Cited:

Thompson v. North American Stainless, LP

Part of
STATEMENT
OF CLAIMS
# 11

**Victoria C Giles**
700 7th Street Apt. #411
New Brighton, MN 55112
(651)808-0812
vickygiles19@gmail.com

18th June 2024

**To Whom It May Concern**

**Andrew Board Recording Secretary/Assistant Business Agent**
President, ATU David S.
312 Central Ave, Suite 345
Minneapolis, ST 12345
P: 612-379-2914
Cell: 651-334-0621
E: ABoardman@atu1005.com

Cc: Minnesota Department of Labor
Apprenticeship Programs
Taylor, Ruth (DLI)
E:ruth.taylor@state.mn.us,

Date: June 18th, 2024
Time: 9:48 PM CST

Subject:  False Claims Act Violations of Metro Transit Must . Metro Transit must
Settle This Claim of Injustice Wrongful Termination & Defamation of Character
Slander and Discrimination/ FHostile Work Environment

Dear Andrew,

It was a pleasure meeting with you, David and staff yesterday concerning this
horrific injustice of wrongful termination and discrimination.

Thank you all for your support.   I am grateful for the union that fights such
injustice alongside  the Minnesota Department of Labor & EEOC just to name a
few. God has a plan that all people are treated equally. I believe that our nation
can do just that.

Sometimes, we must fight for justice for all.

Throughout this letter I will highlight areas of the most stressful , dangerous and unbelievable things that transpired while training and working at Metro Transit that have caused me to report them to the authorities for injunctive relief, restoration of character, and overdue compensation.  Without this remedy at the law of  relief this wicked party will continue to cause irreparable harm.  This party must  be restrained from doing certain hostile and vicious acts while defrauding the government out of billions or trillions of dollars in the name of recruiting new drivers and/or  employing the unemployed. This pazi-scheme was falsely advertising and recruiting bus operators and the like for at least **5% (five percent)** of nearly **$295 Billion dollars grants per yea**r for recruiting and training and hiring new drivers with bonuses.

This scam has been going on for years from inception until termination of the new driver, a hostile work environment  for drivers upon entering -you are lied to about picking your own garage but sent to the garage by the color of your skin and the nationality of your homeland.

*For example, in my class we had 7 men and one me equals eight new candidates.*

**Discrimination began onset with the garages picks:**
I was the only black female . The other classmates were two black American men, three foreign one asians, two black and two white men .

 Eight candidates total and we were given only <u>four garages to choose from-</u>

1.  2 opening in each garage- Haywood -2 black brothers(Dre & Williams) -ghetto garage they call it;
2.   two whites-2-men at Mall of America; two foreign speaking  at Nicollet garage and me-
3.  a black woman & white man- David & I at North Loop.(This is the environment minorities women & white men of the North loop garage).;
4.  This action is discriminatory in itself. Unfortunately, we had <u>no choice of where we wanted to go.</u>

*False Advertising of 1000 of Drivers needed:*

If Metro Transit had 100 jobs opening a month with a ton of overtime then tell me why the cadets could not choose the garage of their choice?

Something is wrong with this picture. The answer is simply they are falsely advertising drivers and other positions to keep the training money and pazi-scheme going.

False claims cases can involve a wide variety of subject matter, but boil down to a simple concept:

- when an individual claims they are entitled to money from the United States government, they may not employ deception, fraud, or false representations in securing that money.

False claims under 18 U.S.C. § 287 is a serious federal crime which carries a possible

maximum punishment of five years in federal prison and/or a fine.

## **FEDERAL FALSE CLAIMS ACT**

*This is fraud perpetrated upon the United States government.* I REPORTED MY FINDING TO MANAGERS & CO-WORKERS-PONZI-SCHEME; AND WAS TERMINATED
I brought this to Charlene, a North Loop Trainer; Dre classmate from Haywood and other Trainer like Will;  Manager Scott and Camile I was  watched and daily placed on the retaliation list even more.

Everyday, my buses were **tampered with inside behind the driver seat where I stored my lunch bag and purse.** One day I entered the bus went to put my bags in the locked bin behind the driver's seat surprised  with 1000 blue masks filled to the brim and the other lock outer broken;

Sometimes I would find nasty stuff from not cleaning or urine, feces, throwing up on the battery door, someone unscrewing my mirrors etc... I see couldn't see on the freeway-accident; and/or death with a big truck as a result of no mirrors; brakes lagging, brakes screaming, brakes low air pressure, gangs on the bus refusing to get off; stalkers on the bus having to call police fearing safety etc...lied on ; three minutes late during training not my regular route harshly discipline sent home for entire day and not trained on the coach like my white male classmate 7 days short.

The job is difficult in itself drivers do not need their managers trying to derail them as soon as they are hired-so that they could keep their training focuses and training money when the new dric=vers are fired or constructively quit.

3

I experienced hate crimes, bullying and much more until they lied to me and wrongfully terminated me. The managers black/white with others-treated me differently. Lied on me . Lied to me that I was doing awesome! Next day I was fired when I was supposed to go back for four hours of training.

## BACKGROUND:

History of Employment:  Hired Jan 15, 2024

Graduated with honors March 5th, 2024

Passed Probation 3 months End of March with awesome remarks.

Evaluation with excellent missing from employment files.

Date of injuries: Feb 19, 2024 Route 3 Eastbound ; High Blood Pressure 250/165; mold dust from fan in driver left on from previous driver in winter time...cause an allergic reaction United Hospital 911 Ambulance .

Worker Compensation: Files missing from personal files;

1. **First incident: Union Depo Denied by Claims' A**djuster Natalie B of Metropolitan Council March 9th 2024
2. **Denied Worker Compensation claims** for both incidents/ accident citing Pre Existing conditions; impossible injuries from light crash'; claims falsely reported non-pre existing conditions for booth claims.(defamation of character)

Date of Accident & Incidents Reports:

All accidents reports and incidents reports are missing from personnel files per my request in accordance with Minnesota State laws.

Feb 19th 2024- March 9th 2024

April 15th, 2024-May 11th, 2024

Explanation of Accident Report/ Incidents Reports (if needed):

4

<u>Hostile Environment-</u> Manager at North loop garage racist made an openly racist remark about February being black history month and celebration What the "F"?

Trainer Managers; Retaliation from reporting brakes lag, steering slackness , mirrors broken or tamper with falling to ground while on the freeway -near death collision with 18 wheelers.

Management vs. Drivers: Upon entering this program and North loop garage I felt a hostile environment; Camile my black manager, asked me if I was single...I said yes. She orders me to not date the men at the garage or period.

However, she met and married her spouse of ten years from there. I was not interested in dating anyone. ***One guy put his arms around me. His name was Maruice, a driver. Camile saw it and hell broke loose in my life. N***asty notes in my boxes; nit picking me hair styles and taking the side of the wrong doers against me...etc..

Tricking me into the Administrative hearing and laughing as she questioned me with the same repetitive questions.  Lied about not getting fired. Never admitted that I had caught the pink bloody eye on Sunday night tApril 14th 2024, **she witnessed my eye-mucus and bloody red  to me driving on April 15th 2024 .**  My eye was hurting. I showed her my eyes and she asked what happened? I informed her that I caught it while driving the night before . She said , have a good day. I was shocked. I left and had the accident

**Safety Violations-Forced to Drive Unsafe Bus. Afraid of missing work two incidents only the third incident due to sickness miss work you are terminated.**Who can live with that kind of pressure in six months seeking to cause an incident . It is not right  and a way for Managers to keep the training money of drivers and cause the poor driver harder employment post termination.

<u>Hostility/discrimination due to reporting Manager to Upper Management:</u>

Harassment and defamation of character surfaced upon reporting any manager or breakdowns of poor maintenance of buses.

Lack of communication is apparent. No written notification of Internal Memos. For example, Camile failed to inform me that she was sending out this very important memo dated April 22nd, 2024 RE: Notice of Investigative Hearing-Conduct, Operating Policy)-( Camile conversed with me like a friend in the beginning by text and cell phone and had my email address of

vickygiles19@gmail yet she lied to me. It was so devastating that Camile would do this to me; she literally-set me up!

The craziest part Camile & I would call each other via cell phone numbers weekly before **Mariuce** (another fellow Driver). She was nice to me-so, it appeared. We would chat via text about our families; to how she met her spouse ten years ago at Metro Transit. I was surprised on April 22, 2024 with my two union representatives, President David & Vice President Jerry that I was the center of a conduct hearing, not an accident hearing as Camile had misled me to believe..

### SET UP HOME/WORK

I had been traumatized with my son merely minutes before work by a police swat team demanding to take my front door off- if I didn't let them in to my home-to arrest my mentally-disabled son behind lies of breaking into his own home-(He is still the owner of property), and stealing his own car keys from his common law ex wife of 13 years with four children house.

Who breaks a door down for that? What SWAT TEAM is needed for such lies?  **I had no problem opening up my door and my son went peacefully . This was blown out of proportion for a reason. That reason was to harass me and make me lose my job and everything I was working hard to catch up on.**

**This was systematically designed to make me quit or to lose it and get fired. Abuse of Powers!**

 Camile & Charlenee knew what I was going through and my ESA Condition recently getting a dog for support -recently due to all of the hostility at work and at home with the police gang stalking.

Upon Termination I received a copy of Data Practices / Tennessen Advisory Subject of Investigation: The purpose of the interview is to gather information in response to allegations of workplace policy violations that have been made against me.

The data that I provided was used by their investigator and others within the Metropolitan Council whose job assignments reasonably require access to the data to determine whether the allegations are substantiated and to the extent., if any, disciplinary action. It may also be used in any subsequent hearings or proceedings related to this matter. The information that I provide during this interview may also be released to the following persons or entities

- Exclusive representative for the employee under investigation;

6

- The Metropolitan Council: Human Resources Department,*(but is missing out of me employee files when I obtained a copy of my records)* Risk Management .S. Department of Labor;
- Licensing boards and agencies;
- Law enforcement agencies and prosecutorial authorities;
- Persons/entities named pursuant to court order; and
- Any other person or entity authorized by state and federal law

In addition, to the disciplinary action that was taken against me in "wrongful termination", this action becomes final, the nature of the final disposition of the disciplinary action, together with the specific reasons for the action and data documenting the basis of the action, excluding data that would identify employees who are confidential sources will **become public data.**

This is where I draw the line in the sand. You have gone too far. Not only do you

- defame my character,
- slander my name,
- terminate me wrongfully,
- stalk, harass,
- offering a hostile work environment,
- humiliate me on Mother's Day with termination
- you have the audacity to lie on me to my face,
- place me and my family in deadly situation-A (SWAT TEAM at my front door for nothing;
- then you smear my employment record;
- take away my God given rights to obtain health care;
- cut off my health care,
- deny me Woker's Compensation-(twice Feb 19, 2024; & April 15th 2024 ),
- lying to Unemployment(that I had five accident and misconduct reports etc...but none of this including the Internal Memo written April 22th , 2024 is in my employee files that your human resources department gave me .

Why was I wrongfully terminated-with only 1 chargeable accident in my file?

Rather,  Metro Transit lying Managers have gone so far that other states and federal agencies across the globe will NOT look at this false record of mine and based on these fabricated lies refuses to hire me!

7

Nonsense, You will Not win! God is for me who can be against me! This lie will not stand.

**Sudden Termination without a Reason:**

***Danelle & Mark Larwson admitted to ATU Union leaders, Anderw & Jerry, that they do not know why they terminated me on Mother's Day Eve***(May 11th, 2024, one month and 2 days away from completing my six months probationary period) without knowing" why". According to Andrew Danelle & Mark said they had absolutely no idea but cas called in that day by upper management to fire me!

**Hostile Work Environment Control ControlCenter:**

**Upon starting Control Center Saturday March 14th or close to that date night Route 722 Brooklyn Center** I was nervous and a bit lost due to the paddle directions that my trainers had given me. I was going in the wrong direction and the passengers started asking and yelling so I radioed the center for help and the young lady robin I believe around said don't worry you are driving right..but I was not.

The Customers had me going. We ended up on Brooklyn Blvd when I should have been turning on 69th & Humlombulot  and returning to BTC and then going to Target Center. The Control tower was laughing when I would call in like it was a game. People yelled at me for taking them in the wrong directions and the brakes were screaming as well. A man at the control center final

Routes and Buses Dates and Central Control giving me faulty Direction ; allowing me to drive a bus entire shift until my last run with low air pressure before switching the bus out. Brakes unsafe.

It took a C-D Line new driver of Haywood on camera with passengers  at BCT Route 722 Saturday night, my second or third run working that route, to board my bus and ground it .

 I had been calling in to the Control Center **all night** requesting help not understanding why my bus was squealing and reporting the brakes issues and not being able to move -it comes and it goes, passengers were complaining as well. After the other driver aboard my bus and two other drivers agreed, the Control Center grounded the **bus on my last run and sent a new bus to me.** This is all verifiable on tape & with the control center.

Upon reporting it to management Camile and Other Manager Scott and Trainers demonstrated resentful attitudes through hostile looks and treatment.

The next week I received a book calling females the B...word on my bus !  A fellow driver that I got hired was riding my bus namely, Dorin Flowers operator working out of Haywood garage riding my bus for safety concerns- He took a picture of it.

***More Hostile Environment Upper Management & Others:*** I was lied to about how the Control Center was not up to par on the new directions of my route and the updated version of the **Target Center route 722 map of Brooklyn Center/Brooklyn Park .**

 In addition,  I was ordered to forget about the brakes' **low air pressure-everyone has gone through it!.**

**"At least I didn't have an accident with all of those passengers on the bus. Be grateful**".

Manager Camile Mitchell and other managers ordered me to let it go. I did. Until it happened weekly. I prayed everyday before I entered the bus;  while I was driving and after ending my shift. I felt **unsafe, stressed and alone.**

 A job I enjoyed doing, working and serving others had become a resentful place of hostility, tomoral and need for survival.

 Finally , I just stopped complaining about the hostile work environment and constant harassment.. If I complained about my brakes on Saturday then on Sunday and everyday thereafter I would get a bus with sticky, nasty urine smelling, nasty books with low air pressure, mirrors broken or tampered with-screws m missing or turned upside down  and always bad brakes.

**Retaliation & Wrongful Discharge final blow.**




Sincerely,

Victoria C Giles

Former Employee,

Operator 84060

Metro Transit

Cc: All organizations Needed